All right, Mr. Smith, you may proceed. May it please the Court, my name is Owen Smith with the law firm of Sigley Austin, appearing on behalf of the appellants. With the Court's indulgence, I'd like to reserve five minutes of my time for rebuttal. All right. The district court abuses discretion in denying appellants motion to intervene as of right. First, because appellants' interest is clearly implicated in litigation in which their ability to reside in the community is being adjudicated. Second, appellants' interests may be affected or impaired as a practical matter because the relief sought doesn't ensure that their current opposition to community placement will protect them in the future. Can you start with your first point and explain to me, because I did, of course, see it in your briefing repeatedly where you said, in essence, we are two in the class. It seemed like the Court was doing everything it could to say, if you want to be where you are, you're not part of this group. And, in fact, the language seemed to, as the original, not the reformulated class in legis, but the original class in legis did, it seemed to track the language of Olmstead. How did the Court misstep there? Why do you think that, after framing it the way it did, that your clients who say, we don't want to be in the class, are somehow in the class? I would like to address that question, Your Honor, first by discussing the interest involved. Here, the plaintiffs have asserted that all residents of the ICFs, the public ICFs in Pennsylvania, can be moved to community care. And the State, the Commonwealth, has not opposed that. They admitted that. The Court in the- The relief they sought had to do with people who do not want to move into the community? Your Honor, the second prong of the class definition identifies individuals who can be moved to the community. The third prong of the class definition provides that individuals who oppose moving to the community or would oppose being moved to the community in the future are not in the class. But it's important to recognize that in the Court's decision denying the appellant's motion to intervene, the Court specifically found that the appellants could be moved to the community and that community placement would be appropriate for them. There have been no facts put before the Court to support that. The Court did not say that the relief sought by the plaintiffs in this action does not have anything to do with these interveners. The relief sought. You said you wanted to discuss the class definition later, so I was asking you first, is there anything in this record that indicates that the relief that the plaintiffs seek will have some direct effect on these interveners? Yes, Your Honor. I think at least in two ways. First, the remedy that plaintiffs are seeking in the form of an injunction from the District Court would require the interveners to voice affirmative opposition every year, year after year, in order to avoid being moved to the community. Where did you get that? Your Honor, if you look at page 296 of the record before you, the plaintiff's proposed order on summary judgment contains provisions for the identification of class members. And that proposed order would require the Commonwealth to ask all residents of public ICFs, MR, every year whether or not they oppose being moved to the community. Okay. So your problem is that the Commonwealth will come back and ask again? Well, Your Honor, the Commonwealth, if the plaintiff's relief which they seek is granted, the Commonwealth would be forced to ask again and again, year after year. Which they're not bothered by, evidently. The Commonwealth isn't opposing it, right? That's correct, Your Honor. And I think that that does go to whether or not the Commonwealth is adequately representing my client's interests below. But on the point of harm or potential harm to my client's interests, my clients are before you today because their guardians have stood up. Right. And if the relief sought here is open-ended, ad infinitum, then there is the possibility that my guardians in the future will not be able to stand up on behalf of the intervenors and oppose. Will they be able to stand up and say we oppose community-based care? Correct, Your Honor. I'm sorry. They won't be? What you said the proposed order would require is a response every year. And you're concerned that at some time in the future, the guardians on behalf of those that they are taking care of won't be able to respond? I don't understand that. Your Honor, as a hypothetical 10 years from now, if one of my client's guardians were to pass away or to become incapacitated for some reason and were not able to stand up for the interests of their client, there is some question about what would be required of a severely mentally handicapped individual to sufficiently indicate their opposition to being moved. Why would it be any different than it was the prior nine years? Well, Your Honor, if the guardian themselves were asked about whether they opposed having their individual move to the community, they could certainly voice their opinion yes or no about whether they were in opposition. But the question is, for instance, my client Beth Ann Lambeau, who is 46 years old, is severely mentally retarded, has the mental capacity of roughly an 18-month-old, is unable to discern danger. If her guardian, Joe Lambeau, were to pass away or were to become incapacitated, what is it that Beth Ann Lambeau would have to do to avoid being swept into this class 10 years from now? Well, assuming you're hypothetical that Ms. Lambeau's guardian is unable for any reason, incapacitated or no longer able to act as a guardian, would Ms. Lambeau be in a position to, entitled to it? Wouldn't somebody be a replacement guardian? I mean, what you're posing is, as a hypothetical, what I think everybody's taking as a given, which is these are people who can't really speak adequately for themselves. But they do have guardians. And it's within the realm of possibility that Ms. Lambeau or her guardian, some combination of decision-making between the two, might change their mind. What's wrong with a class where the court says nobody's going to make you move if you don't want to move, and if you change your mind, someday the Commonwealth will ask you? Your Honor, I'd like to just take a step back and note that while this Court has found that the interest and impairment prongs of the intervention analysis are automatically satisfied by class membership, that doesn't mean that you have to be a class member in order to merit intervention. And here, in addition to the potential that we will become class members in the future, there is also a risk that the remedy that plaintiffs are seeking is likely to result in a severe reduction of the population of these institutional capacity. That's fine. And if you want to move to another topic, that's okay with me, Mr. Smith. But I want to make sure I understand your argument. Are you acknowledging that at least the way it's framed, whether you're comfortable with the Commonwealth coming back to your clients in the future or not, at least the way it's framed, your clients are not members of this class? We are, at present, not members of the class because we currently oppose being moved. Okay. Correct. Now, then, fine. Let's move to your second point, which is, as I understand it is, even if we're not in the class, we're going to be affected. Correct. Okay. Please. Yes. So as to the point about us being affected in a practical way, which is the standard under the impairment prong of the intervention analysis, in a practical way by the remedy that's being sought, the first point that I wanted to raise was that we will need to remain constantly vigilant in order to avoid being swept in the class. The second point is that the practical result of the relief being sought will be the reduction, the significant reduction, of the population of the ICF's MR. And that is likely to result in the closure of some or all of the ICF's MR. If that's true, if that's true, doesn't your argument hinge on the assertion that your clients have a right, not just to institutional care, but to care in a specific institution? That is, they're entitled to be in ICF MR Scranton. I'm making names up. I don't know if there's actually one there. But, you know, that that's the one and I get to stay there, not that they're entitled to institutional care somewhere under the Commonwealth's authority. I think there are two responses to that. First, the response is no, in a sense, because the court has found below that we could be moved to the community. And so that puts us at risk if at a later time the state attempts to move us to the community and we need to proceed in enforcing our rights to stay in an institution in some administrative tribunal of the state where, while we would certainly contest that there's any race judicata or collateral estoppel effect on the court's finding about our ability to reside in the community, it's certainly naive to think that a state administrative tribunal would simply brush past a district court finding of that fact. Second, I think that depending on the circumstances for the particular individual, there may be a right under the ADA and Olmstead to remain in a particular institution. So you are asserting that. You're saying we get to stay where we want to stay, not where you choose to put us in an institutional setting. Your Honor, I see my time has expired. May I answer the question? Please answer. And if that is your position, I take it it is, what's your authority for that? Sure, Your Honor. That is our position that it's possible that certain individuals would have the right to remain in a particular institution. Olmstead held that the ADA entitled individuals to the most integrated setting appropriate to their needs. Olmstead said that what this can mean, and this is a quote from the opinion, that that's a setting that enables individuals to interact with non-disabled persons to the fullest extent possible. Now, certain of my clients, for instance, may reside in the Whitehaven Center, for example, which is very close to their families, and that's the only interaction with non-disabled persons that they ever have. If we were to move them from the Whitehaven Center all the way across the state to, for example, the Polk Center, which is six hours away from their families, that may, for lack of a better word, disintegrate them from the community in a way that would violate their rights. That would certainly be, I have no question that would be upsetting for the families and probably upsetting for the mentally disabled person involved. But what you're saying is that as a matter of federal law, there's a right under the ADA to be institutionalized close to the family. Is that what it comes down to? Your Honor, I don't believe that that's what it comes down to. I believe that we're entitled to intervene whether or not that right exists under federal law. We're entitled to intervene because our interest in our own care is at issue in the litigation below because the court is deciding and has decided that we could live in the community. And in the future, that may become an issue when the state attempts to move us to the community. How do you define community? I mean, I understand your example with regard to the family, but when Olmstead talks about community, they're not including, you know, familial convenience in their definition of community. That seems to have broadened it much more than Olmstead intended. Your Honor, I think that Olmstead found that for some individuals institutionalization is discriminatory precisely because it does not allow them to act as other non-disabled persons do in their everyday lives. And they specifically cited interaction with other non-disabled persons. Right, but that's with regard to community-based versus institutional. But I think it comes back to the question that Judge Jordan had. When you focus on this, what authority is there that your clients have the ability to choose the facility? I mean, if your only basis is what you extrapolated from Olmstead, fine. But is there anything other than that? Your Honor, that issue has not been litigated in any district court. The circuit has not been presented to this court. And I do not cite any precedent aside from Olmstead that potentially could provide us with that right. But I just want to reiterate that I do not believe that it's necessary to find that we have that right or that we don't have that right in order for us to merit intervention in this case. And at bottom, the reason you say that is because you say the court said at some point we could be in the community and that's the way we're affected. I got you right? The court said that we could be in the community and that as a practical matter could affect us in the future, yes. It said you could be in the community with appropriate services. Yes, Your Honor. in a particular situation. And they're not going to put anybody in there if their condition is not such that they don't have the adequate services in the community. I would direct you. He wasn't adjudicating what interveners who haven't even intervened yet were capable of doing in the community or not, was he? Well, Your Honor, I think that the phrase could reside in the community with appropriate services and supports needs to be viewed with realistic bounds. And I don't think that the court was suggesting that with appropriate services and supports would entail moving an ICFMR into a community. There are individuals who require institutional care. And, in fact, Justice Kennedy's concurrence in the Olmstead decision recognized that and warned courts not to proceed too rapidly through this process without and potentially damaging people's right to remain in an institution. It seems to me that you're saying we may, as a practical matter, whether or not we're included in the class, as a practical matter, we may be affected because there are limited resources and the department may choose to, will have to implement the relief that's being given here. And that may mean that some institutions will be closed because public funds are limited. Now, can we live with a rule that anybody that is competing for public resources is entitled to intervene in a case that's going to put a burden on public resources? I realize you say that the relief here somehow is designed so that it will – that they're asking for relief that will directly affect the interveners. I have trouble seeing that. Clearly, if they were asking for relief that would have a direct effect on interveners, you'd be entitled to intervene as of right. But assuming that the relief will not directly affect them, is it sufficient to say, well, the Pennsylvania is going to have to fund anything that comes out of this lawsuit and they're going to have to find the money somewhere in the limited budget? And therefore, since I'm in the budget and want things financed by the budget, then I'm entitled to intervene in their lawsuit? Well, Your Honor, I think what makes this situation different from the hypothetical that you proposed is that the state here has conceded that when they move one individual from an institution, they don't save any money unless they close the entire wing of that institution or the institution as a whole. So I think that it's not merely speculative that funds will be transferred away from these institutions and that that will have an effect on us. I think that there is evidence in the record below demonstrating that there is a likely practical effect of the proposed remedy. I'd also like to point out that the plaintiff's proposed remedy on summary judgment, which I pointed to earlier at page 296 of the record, in seeking to identify class members makes no provision for individual determination of who should be moved to the community. If the plaintiff's remedy is granted, simple failure to oppose will require the state to put the individual on a planning list to be placed in that community. But if you have a guardian, why is that a particular concern? I mean, presumably the guardian would step in. Even in your hypothetical, which I think Judge Jordan responded to adequately, which is there would be a substitute guardian, that guardian will be able to act on your client or whomever's behalf and respond in a way that's appropriate for them. If it's someone who's higher functioning than your client, maybe they do. If they don't, they'll have the opportunity to vote, express their thoughts on where they should be. It is certainly possible that some of my clients would wind up with a substitute guardian in the future if one of their current guardians were to pass away or to become incapacitated or for some other reason cease being their guardian. But it's also possible that my clients would just become wards of the state. And in that respect, I think it's important to recognize that all of my clients here and the only individuals in any of the ICFs who have stood up and voiced their opposition at this point to being moved are those who have guardians. Well, you wouldn't contend, would you, that because some people disagree with the Commonwealth, that the Department is ipso facto an inadequate representative of the interests of mentally disabled folks, would you? I mean, that would be a pretty dramatic position to take, that you just can't trust the Commonwealth. Yeah, that's not our position, Your Honor. Our position is first that the district court abuses discretion because in ruling that the Commonwealth adequately represented our interest, it held that we had failed to show gross negligence on the part of the Commonwealth, which is not the standard in this circuit. The standard in this circuit is a mere presumption that a state agency adequately represents the interests of individuals that it's charged with representing. And here that presumption is rebutted by the fact that the state didn't oppose at any point below that all individuals in the institutions are capable of being moved to the community. With appropriate services. That's correct. I mean, isn't that, when you put that qualifier on it, I suppose, now you say, well, realistically that can't mean appropriate services because they're not going to build an institution for one purpose. But that's a very strong qualifier, isn't it, with appropriate services? I mean, as a theoretical matter, anybody could be in any setting with appropriate services, right? Theoretically, Your Honor, but the state has also admitted in discovery responses, I believe in response to a request for admission in the proceedings below, that there is not an individual in the institutions for whom they're not serving an equivalent person in the community, which would seem to suggest that, in fact, there are services and supports in the community that could be provided for anyone in these institutions. We fundamentally disagree with that. We don't think that that's true, but we are being prevented from testing those factual assumptions below. Right. Okay. Thank you. Any other questions? No. Thank you, though. Thank you very much, Mr. Smith. We'll have you back on rebuttal, and we'll hear from the first of our amicus. Hi. Leslie Esposito, representing amicus Voice of the Retarded, or VOR, V-O-R. Thank you for allowing me to speak today. VOR is a nationwide nonprofit advocacy organization dedicated to ensuring that individuals with mental retardation receive the care and support they need in the settings appropriate to fulfill those needs. VOR is not opposed to community-based care. VOR advocates for a range of care and services. There are certain serious risks associated with the mass movement of disabled individuals to community settings. These risks of abuse, neglect, and serious health concerns are due in part to the decreased oversight that exists in community settings. Contrary to statements in amicus, the ARCS brief, and certain statements by appellees, there is, in fact, decreased oversight in community settings. In ICF's MR, there is- How is that going to be relevant, though, to the specific question before us, Ms. Esposito, which is whether or not Mr. Smith's clients are entitled to intervene in this particular action? I think I understand the position of Voices of the Retarded Inc. to be, as you just articulated it, there are dangers associated with community placement. Just as I'm sure others would argue, there are dangers associated with institutional placement. But how does that impact the specific legal question we're faced with? VOR believes that if the intervener appellants are not permitted to intervene in this matter, then absent that intervention, the rights of those individuals who do not wish to leave the ICF's MR will not be protected. And we feel that the serious risks associated with community settings go to the, I guess, the strength and importance of those interests. Is your position that the resolution of the class action could essentially make the ICRs extinct? Yes, we think that there is that serious possibility that because this is brought as a class action and not merely on behalf of the named plaintiffs who are seeking community placement, that the result could be closing all five remaining ICFs MR. And while there are private ICFs MR, we don't believe that those are really a true substitute, due in large part to the fact that there is a lengthy wait list for those institutions. So it really is not a viable option to go into those facilities. So, is the argument that intervention, well, your argument isn't that class action itself is inappropriate, is it? Are you saying that a class action itself is not an appropriate vehicle under these circumstances? No, we're certainly not saying that a class action is not an appropriate vehicle. We're simply saying that because this was brought as a class action, the interests of the interveners are at serious risk. And your Honor referenced the Ligas case, and when you look at that case, that was a case where potential interveners were not allowed to intervene, a settlement was negotiated, and there were, I believe, thousands of objections presented at the fairness hearing, which caused the court to reject the settlement. Wasn't the class definition in Ligas changed? I mean, isn't it the fact that the class definition, which was upheld by the Seventh Circuit, was changed by the District Court, and then there were mass objections to it that led to the decertification? Am I right factually? Yes, yes, Your Honor. Okay, so the decertification and the massive objections that were made, they're not really pertinent to what we're dealing with, because what we're dealing with is a class shaped on the same lines as the class certification, which the Seventh Circuit upheld in Ligas, not the class certification as it changed later, and which led to objection, right? True, but in Ligas, the parties that attempted to intervene were ultimately part of the settlement negotiations that have now resulted in a proposed settlement that the proposed interveners, in that matter, agreed with being presented to the court. And at this point, a fairness hearing is scheduled, and they do not anticipate there being any objections based on the participation of those individuals. Okay. Thank you very much. Thank you very much. Mr. Solano. Good morning, Your Honors. May it please the Court. My name is Carl Solano. I am a guardian for my sister, Diane, who is a resident at one of these centers in Whitehaven. I am here representing her as an amicus, and I want to thank the Court for allowing me permission to argue on her behalf today. Thank you. We're grateful to have you here, Mr. Solano. Your Honor, what's the interest and how is it affected? Diane has lived at the Whitehaven Center for 45 years. That's what she knows as her home. She knows the people there who care for her. She knows the facilities. That is all she knows. She has a mental age of one year or less. She is incapable of living in the community. Judge Jordan, you ask, is there a right to live in a specific center? I believe there is. I believe that for someone in that situation who has lived there their entire life, they have an interest. And, Your Honor, the question under the Kleesler case, I think I said that right, which I believe is the Court's primary authority with respect to intervention, is it does not have to be a legal right under federal law. It has to be a protected interest. There certainly is an interest in maintaining your home. There is a further interest under state law. We cite the Bear case and the Easley case in the amicus brief, in which state courts have recognized an interest in staying there when you have lived there, as my sister has, for 45 years. There is an interest here. What was the case you referred to? Your Honor, they are cited in the amicus brief. One is Inree Bear. It's a commonwealth court, excuse me, a common police court case in Pennsylvania. The other one is called Inree Easley, a commonwealth court case in Pennsylvania. They're not precisely on point, but I believe, Judge Stapleton, when you read them you will see that they recognize an interest in living in a facility of longstanding duration, and those facilities were state centers, as we have here. How is it affected? It is affected because the plaintiffs contend, and the commonwealth has agreed, that every resident of a state center can be moved to the community, everyone. And the commonwealth has contended, and the state has agreed, that the policy is to move everyone to a state center. Now the plaintiffs say, and the commonwealth agrees, that the protection against that is opposition. If you oppose it, we can't force you to move. I want to get to that in a second and talk about guardians. But the fact of the matter is that this litigation, if successful, will result in depopulation of most of the centers. It is obviously a financial necessity that some of the facilities will have to close. You can't keep them all open. Judge Stapleton, it's not a question of competing for government funds. There's more to it than that. It's a question of how do you choose where you are going to spend specific government funds with respect to housing mentally incapacitated individuals under circumstances where they have been living in these facilities for 45 years or longer. I'm sorry. Mr. Smith mentioned in his presentation an allusion to a right to live at a particular facility. Are you proposing that, I presume you agree with him or you do not on that? I submit, Judge Greenaway, that where you have individuals who have been living in these facilities for as long as they have and where that is the only care and, in effect, family that they know, they have an interest. And, Judge Greenaway, I'm trying to be careful here and say interest because that's the language of Rule 24. Not right, not federal right, not legal right. It is interest. They have an interest in staying in those facilities that is sufficient to allow them to be heard. I think we need to be clear here. I think we all agree. No one in this case, certainly not the intervener, certainly not me, no one in this case opposes the relocation of any resident of any of these centers who is capable of being relocated and who wants to move. We're in favor of that. Mr. Solano, how would you have had the district court frame the class? The district court clearly was at pains to try to make sure that nobody, like yourself speaking for your sister Diane, who did not want to be moved into the community would be bound in any way by this class. That seems, I mean, would you agree that that seems to be the focus and effort of the way the class was framed? I agree that that was the effort, yes, Your Honor. Okay. So if the court misstepped somehow, what should the court have said or done or could the court have done anything that would have given you, as a concerned guardian for your sister and others like you, the sense of peace of mind or comfort that what's being done here is addressed to people seeking community-based housing and not people like my sister who does not want to move, who I don't want to have moved. How could they have done it different? How could the court have done it differently? Your Honor, in terms of class definition, there may not have been anything further that the court could have done. Your Honor, I submit, and I disagree with my colleague Ms. Esposito, I submit that a class could be certified here. There are so many individualized issues. They predominate in so way, particularly on a 23B2 non-opt-out class, that there cannot possibly be the cohesiveness necessary to permit class certification. But we're not talking here about class certification. We're talking about intervention. And so, yes, maybe the class certification order tried to protect that right. The question is whether the individuals who may be outside that class, and my argument assumes I'm not a member of this class. I will assume that. The question is whether their interests, nevertheless, are so affected that they should be permitted to participate in this litigation. And, Your Honor, we submit they do because the interest is strong, and because the interest is clearly going to be affected, because some of these institutions are going to need to close. Now, Your Honor, I know I'm out of time, but let me just talk for a second about guardians, because, Your Honor, the record says that 82% of the residents of these institutions have no guardians. That's at page 238. There's a chart in which you can calculate it. The guardians that they do have are dying. Their guardians are their parents. In some situations, siblings such as myself can get appointed as new guardians. In many cases, that doesn't happen. The families live far away. The families have had no association with these individuals. And as a result, they get no new guardian. And, Your Honor, there is some chilling testimony in the record, which you can find, and I can find a site for you in a second, in which you will see that it is the position of the plaintiffs, and it is the position with which the State agreed at a deposition, that once a guardian dies, the guardian's opposition no longer counts, that the family opposition no longer counts, that at that point the individual is considered a ward of the State, and it is a question of whether the State opposes it, and of course we know they don't because it is the State policy to favor removal from the institution, and it is the State's statement that all individuals can be removed from the institution. The deposition site, Your Honor, is at page 226 to 228 of the appendix. So, Your Honor, the central point here is that you are dealing with an extraordinarily vulnerable population of individuals. These are people that cannot make decisions for themselves. If you look at that same page of the chart, which I cited to you a minute ago, you will see that when they asked, what is your view about moving to the community, 75 percent didn't say anything because they are incapable of saying anything. They don't understand the question. Most of them don't have guardians. It is impossible to discern what their needs are, what their wants are, what their desires are. And so they are extraordinarily vulnerable to an incorrect decision being made. They have needs, medical needs, care needs, security needs, and there is an extraordinary risk in this case that if a wrong decision is made, it will be catastrophic. All we are asking for here is a seat at the table so that we can make sure that the decision is made correctly and with full knowledge of all of the issues because we believe that all of the issues and facts were not explored. Let me keep you here for just a second to ask a follow-up question, Mr. Solano, with the indulgence of my colleagues. How would intervention meet the concern you've just raised? I understand the concern you've just raised to be the vast majority of the population don't have guardians, and so no one can speak for them, and the states can't, and I don't want to put words in your mouth, you wouldn't perhaps put it this harshly, but in effect you seem to be saying the Commonwealth has its financial interests here and their interest is to get people into the community, so they're not really going to be paying attention here the way a guardian might. Assuming all that were true for the sake of discussion, what would intervention do to address that problem? That there are a large population that are wards of the state, they don't have guardians, and they may get moved into community-based housing when they would rather not be. How does admitting to the case or allowing intervention of people who do have guardians going to address the problem you identified? We can assure that the factual and legal issues in the case are appropriately framed and litigated so that the court has the correct facts. For example, this case starts with a stipulation. They alleged the Commonwealth concedes it, in effect a stipulation, that these individuals are isolated in rural institutions so that they are not sufficiently integrated in the community. They make it sound like they're in the middle of Siberia. My sister is in Whitehaven. My parents deliberately placed her in Whitehaven because it's about 30 minutes away from where they live just outside of Wilkes-Barre. She's in the Poconos. The Hamburg facility is 30 minutes from Allentown. Sillings Grove is in Susquehanna Valley. They're not in the middle of nowhere. They are not isolated. They have all sorts of activities outside. That's one fact, Your Honor, that we would contest. Second fact, we would contest facts as the answer, and I can give you other examples, Your Honor, if you'd like them. Your point then, if I get it, is your point is by speaking for those who do have guardians, the court would have a different perspective overall. Much different perspective. They would have the facts, which right now it doesn't have because the facts were stipulated to the contrary. Okay. Any other questions? Thank you very much, Your Honor. Thank you, Mr. Solano. All right. Mr. Meek. At least the court, Your Honor, my name is Robert Meek. I represent plaintiff's appellees in this matter and the class. Your Honor, we would first like to emphasize that as we have tried throughout this litigation, and I believe the Commonwealth has as well, is to protect the interests of persons like the interveners who do oppose community services, and that's why the class was framed as it was. That's why the relief we sought was framed as it was. And the interveners will not have any impact upon them by any relief granted by the court, and their interests, if I may speak to Mr. Smith's points, their interests are not legally protected interests because I think Mr. Smith acknowledged, but Mr. Solano does not, that there is no right to a particular institutional setting that the interveners can demonstrate. Why don't you speak to that point? Sure. Speak directly to the question of do people have a right to be in a specific institution? No, what people in ICF's MR have is the right to ICF MR level of services. Their right is under these facilities are funded through the Medicaid program, which is a joint state federal program where the state pays approximately 50 percent of the costs and the federal government pays the other 50 percent. The problem is that the Medicaid program also requires people to receive services from any willing provider, willing and able provider. So there are providers of Medicaid services that not only the state operate ICF MR's, but over 200 providers of privately operated ICF's which house around 2,500 persons. So the fact is that the real interest of the appellants is the continued right to ICF MR services, not the particular ICF in which they currently reside. So if the state were at some point in the future to stop operating state one or more state operated ICF's, the appellants would still have the right to ICF MR services, albeit at a different location, but they would still have that right and that cannot be denied. They're eligible. And their ability to be heard in this instance wouldn't affect or you're saying there's no interest so they don't have a right to try to affect essentially the conversation in the lawsuit? The question is, Judge Greenway, the relief is couched in terms that anyone who is opposed is not going to be affected by any remedy that's imposed or negotiated by the parties. So they do not add anything to the conversation. Well, speak to Mr. Solano's point then, Mr. Meek, which is that they do have something to add because the court isn't getting an accurate factual statement. The facts, I think Mr. Solano's point is the facts are that some people are not appropriate for community services. I believe that's the main contention he makes. But the class definition in all the relief goes and tracks Olmstead and Olmstead says very clearly as does Frederick L. II from this court that the state is entitled to rely on this professional judgment of its treating professionals, those institutions, to make the determination of whether an individual with a mental retardation is appropriate for community services. That is what the language of Olmstead is, the language of Olmstead is where the state professionals determine the purpose is appropriate and the person is not opposed and it can be reasonably accommodated by the state. That makes out a claim for integration mandate. So there's no factual record that the interveners can make that would undermine the requirement of this court and the Supreme Court that the professionals are entitled to deference and no determination of appropriateness for community services. Well, I thought Mr. Smith raised the point that and Mr. Solano as well about opposition. Mr. Solano's point helps Mr. Smith's point because he says 82% or 82.6% of the folks in ICFs don't have guardians. Mr. Smith raised the point that you'd have to, under what's proposed, either specifically vote or voice your opposition. So therefore, it would appear, putting the two together, 82% of the people have no ability to voice their opposition in futuro and that's their concern that that particular fact be taken into account in the lawsuit and it's one of their indicia as to why they should be permitted to intervene. Again, Your Honor, I think the judge made this point. They're interveners and their guardians have guardians so they can't really speak to that. But more to the point, because the state is, in fact, operating as a de facto guardian for many people because family members have either died or no longer have contact and the individual has no guardian or other family member willing to take responsibility for the individual and the fact that the state, and I don't mean the state, but the facility director, through the treatment professionals at each of those facilities who have cared for the individual for years, who the appellants and amici stress are very caring and can do a great job of protecting their interests and caring for them, those are the individuals that should be and are in place to protect the interests as to whether an individual is opposed or not opposed to the placement in the community. So let me make sure I understand because I don't want to speak for anybody else, but if I understood the argument that was being made by amicus and by Mr. Smith on behalf of the interveners, the position that they've got is the Commonwealth has a fundamental interest financially in getting people into lower cost housing. So they're going to move people if they don't say stop and people can't say stop by definition because the population is people who are mentally disabled and the Commonwealth is saying no matter how many times the guardians, the people, the loving parents, siblings, etc. said no, no, no every year when the Commonwealth came back. When they pass from the scene, the Commonwealth will be there to say and now we say yes for you and that that is a system that's being set up by this litigation which is fundamentally wrong or unfair or bad for folks who are institutionalized. They shouldn't be put in a position where once their loved ones pass from the scene, they're sort of at the mercy quote unquote of Commonwealth actors who have financial interest in moving on. That's, I repeat, I don't presume to speak for them, but that's kind of the tenor of the argument as I understand it and I would like you to speak to that argument which is by the way this is set up, at some point the Commonwealth is going to get what it wants in its financial interest by default and no one will be there to stop it because of the way the class is arranged. First of all, Your Honor, I don't think it's necessarily solely a financial interest that motivates the Commonwealth. They are interested and motivated by providing appropriate services to the people they've been caring for in institutional care. They are based on scientific evidence of the understanding and belief that it is appropriate for anyone to be served in the community given the sufficient supports and services. All of this, though, I must say, Your Honor, still misses the point that even if the Commonwealth closed all the facilities, the private ICFs would still be available and... Mr. Esposito says waiting lists a mile long. It's really not meaningful. I'm not sure that's accurate, Your Honor, and even if it were, the Commonwealth is not about to dump people in the street while they're on a waiting list for a private ICF. I don't think that we can presume that. But back to your point, I think that the Commonwealth is being cast in this very cold, harsh light that they're an uncaring, unwilling to take into account people's needs and that's just not the case. On one hand, the appellants and the amici are saying the Commonwealth takes great care of people and we think they do a good job and they know what they're doing and they've done a good job. On the other hand, they say, but they really don't understand these individuals. They don't really get that they have serious problems and they don't really understand they couldn't possibly survive in the community. That can't be true. Both of those things cannot be true. The fact is that the Commonwealth, through its professionals, and again, we have to get down to what Olmstead and Frederick L, too, says, is that the Commonwealth is entitled to rely on its professionals to make those determinations of whether a person is appropriate for services and also in the absence of anyone else speaking for the individuals at the ICFs, there is no one else but the state to speak for them. The state, through its professionals, are the most well-placed persons to understand the wants and needs of the individual who they've cared for for years. And the fact that the family and guardian in the past has opposed that community services really doesn't necessarily speak to whether the individual, him or herself, actually opposes or does not oppose. I think that you have to leave the decision-making to the professionals, which is what Olmstead requires and what Frederick L, too, requires. No further questions, Your Honor? Actually, just give me just a couple seconds. I understand your legal argument. Maybe this is a little off the grid. What's the practical downside of having them intervene? Class decertification. And that will impair not only the class's ability, those people do not oppose to gain the relief they seek, but in fact because of how Olmstead is framed, the individual plaintiffs would also be likely foreclosed because they would be accused of so-called queue jumping if they were to continue a litigation on behalf of a few people. What Olmstead said was that that would be a violation of fundamental alteration of the state's programs if you allow some individuals, because they brought litigation, to jump ahead of everyone else who's similarly situated and who wants to leave and is appropriate for leaving. You cannot do that under Olmstead, because that undermines the state's ability to function as it should, to take into account all other interests, et cetera. How would allowing them to intervene result in queue jumping? Because, Your Honor, their main intent is to decertify the class. So once that's done, the class members, many of whom could not bring litigation on themselves, I didn't understand that your argument was presuming decertification, but you're saying if they're allowed to intervene, it will result in decertification. Your Honor, I don't think there's any other way to read what they've said in their briefs. They seek decertification. And why would intervention in and of itself result in decertification? Intervention in and of itself would not, of necessity, ipso facto result in decertification. But that is the intent of the appellants. I don't think they can deny that. And as a consequence, that would be brought to the district court. The court would be then in a position to have to decide whether it should decertify. And if it should do that, then our clients are out of court, the plaintiff's class is out of court, and also the plaintiffs themselves because of the queue jumping problem. Okay. Thank you very much, Mr. Mayor. Thank you, Your Honor. Mr. Smith, your rebuttal. Do you want to start with class decertification? Yes, Your Honor. Okay. Your Honors, our main intent is not to decertify the class. And I believe that the point that decertification may result from our participation actually Would you stipulate that you would? No, Your Honor. I think that we will certainly move the court under Rule 21C, 23C, to decertify the class. If the class is not cohesive and if it's not proper, it shouldn't be a class action. But that simply proves the point that we should be in this litigation to test whether or not the unopposed class. So is Mr. Meek-Wright, your purpose is to decertify the class? No, Your Honor. Our purpose is to have a voice in the litigation. Whether or not the class is decertified, it's important that our voice be there. In the case of Brody, which is cited in our briefs, this court recognized that there may be and, in fact, could be an interest in the remedy phase of litigation, even if proposed interveners didn't have an interest in the merits phase. So following Brody, is your secondary position that you be permitted a limited intervention for remedy purposes only? I think that's one of the things that Brody stood for. That is what Brody says, Your Honor. We believe that we should be permitted to intervene in the class and intervene in the litigation and move to decertify the class simply because the court has issued summary judgment, making factual findings about our ability to move to the community. And we believe that that should not be a factual finding that applies to every single individual in the ICF's MR. That being said, at the very least, we have an interest in how the remedy is formed here that's going to apply to the class, in part because we could become part of the class in the future. So even assuming that we don't have an interest in the merits phase of this litigation, we do absolutely have an interest in the way the court shapes the remedy. And in its summary judgment decision, the court specifically left open what the remedy will be here. Is it your thought that clearly the district court has the responsibility to determine what the rights of people who want to have community placement are and to enforce those rights? I would concede that. Do you understand that the district court will oversee how the department will decide to comply with the judgment in the court in terms of financing it and closing institutions or not closing institutions? Do you think the district court is going to get into that? To the best of my understanding, Your Honor, the parties following the district court's decision on summary judgment agreed to go to mediation to determine amongst themselves what the appropriate remedy would be, which they would obviously have to take to the court for approval. But we certainly believe that having our voice at the table... They can't get a remedy they haven't asked for, right? That's correct. But I would again encourage... If they can't get the remedy, somehow the remedy is in their judgment. Correct, Your Honor. And the district court, you think, is going to say, Well, wait a minute. I've got to see how the department is going to satisfy its obligations under this judgment in a way that's not going to adversely affect anybody else. Is the district court really going to go to board meetings of the department to decide how the state is going to meet its obligations under this judgment? No, Your Honor. I don't expect the state to. Then it won't matter if you're not there. You're saying we should be there because we have to have a voice in how they are going to meet their obligations to the plaintiffs. We ought to have a voice. And if that's the decision that's going to be made in the board of directors' meetings of the department, how is it going to matter whether you were interveners when the rights of the people who want to live in a community were decided and a judgment was entered? Well, Your Honor, I just want to emphasize that I believe that we have a right to intervene with respect to the merits of this decision. But with respect to the remedy in particular, I think that what we need to ensure is that the rights of everyone in the ICF-SMR are being accounted for in the remedy and that the remedy doesn't affect everyone's rights as opposed to only, as you say, the individuals who want to be moved and are qualified to be moved to the community. If your clients have a right to retain placement in specific institutions, can they not protect that right by bringing their own suit? Why do they need to be in a suit that's talking about somebody else's rights? Why don't they sue and rely on their own rights? That cuts exactly to the core of why we need to be involved in the merits of this case because the parties have conceded, both parties have agreed, and the district court has found that everyone can be moved to the community. So in a later proceeding, whether it be before a state administrative tribunal or a state court or a federal court or whomever, there are factual findings by the federal court here that state that we can be moved. How could those findings affect, assuming they are as you characterized them, how could they possibly be preclusive of people who are not in the class? I don't believe that they would be preclusive, Your Honor, but I also don't think it's realistic to assume that in a subsequent proceeding that whatever court or tribunal is addressing this would simply brush aside those facts. I think that they will color the proceedings. So you're saying that even though as a matter of law they couldn't be preclusive, sort of sub rosa they'll end up being? They will certainly, I think, realistically, Your Honor, and this inquiry about impairment is an inquiry centered on practicality. As a practical matter, it will influence significantly any further proceedings about whether or not we could be moved out of the particular location that we call home. So that presumes that courts won't take separate litigation for people who aren't precluded at face value and hear those facts without being affected by what was said in a different lawsuit, right? I think what it presumes is the potential that the state, if it decides it's in the state's interest to move all residents out of a particular ICFMR, could use this factual finding as a sword against us in subsequent proceedings. They could, and that could color the proceedings. Let me ask you this question. Procedurally, if you were allowed to intervene in a limited matter, I know that's not your first position, but in a limited matter for remedy only, right, in that procedural posture, I presume you would not be permitted to move to decertify. Is that wrong? I believe that the ability to move to decertify under Rule 23 would apply as long as there hasn't been a final judgment entered by the district court and there hasn't been a final judgment entered here. So despite the fact that the court has entered a decision on summary judgment on the merits, that would not preclude us from moving to decertify the class at this juncture. So procedurally, I'm just interested, you'd move for reconsideration of summary judgment and then move for decertification, I guess? Well, to be frank, Your Honor, we have not decided on our litigation strategy. But I do want to reiterate that if the class is an inappropriate class, our motion to decertify will be granted. If it is an appropriate class, it will be denied. And the question, I assume, will be cohesiveness, whether or not it's appropriate to have a class where individual determinations about people's ability to reside in the community is insufficient for class litigation. Okay. Thank you very much, Mr. Smith. Thank you. And thank you, one and all, for your time and your participation. It's very much appreciated. Can we take five? Yeah, sure.